## UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

## MONROE DIVISION

| | | |
|---|---|---|
| **ANTHONY RAY COOK** | * | **CIVIL ACTION NO.  13-3046** |
| **VERSUS** | * | **JUDGE ROBERT G. JAMES** |
| **CAROLYN W. COLVIN, ACTING COMMISSIONER, SOCIAL SECURITY ADMINISTRATION** | * | **MAG. JUDGE KAREN L. HAYES** |

### REPORT & RECOMMENDATION

Before the court is plaintiff's petition for review of the Commissioner's denial of social security disability benefits.  The district court referred the matter to the undersigned United States Magistrate Judge for proposed findings of fact and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and (C).  For the reasons assigned below, it is recommended that the decision of the Commissioner be **AFFIRMED**, and this matter **DISMISSED** with prejudice**.**

### Background & Procedural History

Anthony Ray Cook protectively filed the instant application for Title XVI Supplemental Security Income payments on August 15, 2011.  (Tr. 134-139, 146).  He alleged disability as of May 31, 2011, because of a lack of social interaction.  (Tr. 150, 156).  The state agency denied the claim at the initial stage of the administrative process.  (Tr. 58-71).  Thereafter, Cook requested and received a May 9, 2012, hearing before an Administrative Law Judge ("ALJ").  (Tr. 22-57).  In an August 22, 2012, written decision, however, the ALJ determined that Cook was not disabled under the Act, finding at step five of the sequential evaluation process that he was able to make an adjustment to work that exists in substantial numbers in the national economy.  (Tr. 6-18).  Cook appealed the adverse decision to the Appeals Council.  On

September 24, 2013, however, the Appeals Council denied Cook's request for review; thus the ALJ's decision became the final decision of the Commissioner.  (Tr. 1-3).

On November 12, 2013, Cook sought review before this court.  He alleges the following errors:

(1)     the ALJ's step three finding that Cook's impairments do not meet Listing 12.06C is not supported by substantial evidence;

(2)     the ALJ's residual functional capacity assessment is not supported by substantial evidence; and

(3)     the ALJ' step five determination is tainted because the ALJ's hypothetical to the vocational expert did not include all of plaintiff's limitations of functioning.

## Standard of Review

This court's standard of review is (1) whether substantial evidence of record supports the ALJ's determination, and (2) whether the decision comports with relevant legal standards.  *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990).  Where the Commissioner's decision is supported by substantial evidence, the findings therein are conclusive and must be affirmed. *Richardson v. Perales*, 402 U.S. 389, 390 (1971).  The Commissioner's decision is not supported by substantial evidence when the decision is reached by applying improper legal standards. *Singletary v. Bowen*, 798 F.2d 818 (5th Cir. 1986).  Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Richardson v. Perales*, 402 U.S. at 401.  Substantial evidence lies somewhere between a scintilla and a preponderance.  *Muse v. Sullivan*, 925 F.2d 785, 789 (5th Cir. 1991).  A finding of no substantial evidence is proper when no credible medical findings or evidence support the ALJ's determination.  *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).  The reviewing court may not reweigh the evidence, try the issues *de novo*, or substitute its judgment for that of the

Commissioner.  *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994).

## Determination of Disability

Pursuant to the Social Security Act ("SSA"), individuals who contribute to the program throughout their lives are entitled to payment of insurance benefits if they suffer from a physical or mental disability.  *See* 42 U.S.C. § 423(a)(1)(D).  The SSA defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).  Based on a claimant's age, education, and work experience, the SSA utilizes a broad definition of substantial gainful employment that is not restricted by a claimant's previous form of work or the availability of other acceptable forms of work.  *See* 42 U.S.C. § 423(d)(2)(A).  Furthermore, a disability may be based on the combined effect of multiple impairments which, if considered individually, would not be of the requisite severity under the SSA.  *See* 20 C.F.R. § 404.1520(a)(4)(ii).

The Commissioner of the Social Security Administration has established a five-step sequential evaluation process that the agency uses to determine whether a claimant is disabled under the SSA.  *See* 20 C.F.R. §§ 404.1520, 416.920.  The steps are as follows,

(1)    An individual who is performing substantial gainful activity will not be found disabled regardless of medical findings.

(2)    An individual who does not have a "severe impairment" of the requisite duration will not be found disabled.

(3)     An individual whose impairment(s) meets or equals a listed impairment in [20 C.F.R. pt. 404, subpt. P, app. 1] will be considered disabled without the consideration of vocational factors.

(4)    If an individual's residual functional capacity is such that he or she can

3

still perform past relevant work, then a finding of "not disabled" will be made.

(5)     If an individual is unable to perform past relevant work, then other factors including age, education, past work experience, and residual functional capacity must be considered to determine whether the individual can make an adjustment to other work in the economy.

*See Boyd v. Apfel*, 239 F.3d 698, 704 -705 (5th Cir. 2001); 20 C.F.R. § 404.1520.

The claimant bears the burden of proving a disability under the first four steps of the analysis; under the fifth step, however, the Commissioner must show that the claimant is capable of performing work in the national economy and is therefore not disabled. *Bowen v. Yuckert*, 482 U.S. 137, 146 n. 5 (1987). When a finding of "disabled" or "not disabled" may be made at any step, the process is terminated. *Villa v. Sullivan*, 895 F.2d 1019, 1022 (5th Cir. 1990). If at any point during the five-step review the claimant is found to be disabled or not disabled, that finding is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

### The ALJ's Findings

## I.     Steps One, Two, and Three

The ALJ determined at step one of the sequential evaluation process that Cook had not engaged in substantial gainful activity during the relevant period. (Tr. 11). At step two, she found that Cook suffers severe impairments of depressive disorder and anxiety disorder. (Tr. 11-12).[1] She concluded, however, that the impairments were not severe enough to meet or medically equal any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4, at step three of the process. (Tr. 12-13).

## II.    Residual Functional Capacity

The ALJ next determined that Mitchell retained the residual functional capacity ("RFC")

---

[1] She determined that Cook's obesity and hypertension were not severe impairments. *Id*.

to perform work at *all* exertional levels, subject to the following non-exertional limitations, the need to avoid unprotected heights and dangerous moving machinery, the ability to only occasionally adapt to changes in the workplace and to make work-related decisions; the inability to work with fast-paced production quotas or to travel to unfamiliar places; and the need to work in isolation with no public contact, and only occasional contact with supervisors and co-workers. (Tr. 14-16).

## III.   <u>Steps Four and Five</u>

The ALJ concluded at step four of the sequential evaluation process that Cook had no past relevant work. (Tr. 16-17). Accordingly, she proceeded to step five. At this step, the ALJ determined that, during the relevant period, Cook was a younger individual, with a high school education and the ability to communicate in English. *Id*. Transferability of skills was not an issue because of the lack of past relevant work. *Id*. She then observed that given Cook's vocational factors, and if he had an RFC that did not include any non-exertional limitations, then the Medical-Vocational Guidelines would direct a finding of not disabled. 20 C.F.R. § 416.969; Rule 204.00. *Id*. However, because Cook's RFC *did* include non-exertional limitations, the ALJ consulted a vocational expert ("VE") to determine whether, and to what extent his additional limitations eroded the occupational base for unskilled work at all exertional levels. (Tr. 52-53). In response, the VE identified the representative jobs of cleaner and polisher-light, *Dictionary of Occupational Titles* ("DOT") Code # 709.687-010; cleaner, housekeeping, light, DOT Code # 323.687-014; and kitchen helper, medium, DOT Code # 318.687-010, that were consistent with the ALJ's RFC and Cook's vocational profile. *Id*.[2]

---

[2]  The VE testified that for the cleaner- polisher job, there were 524,000 positions nationally and 8,400 jobs regionally. (Tr. 52-53). For the cleaner- housekeeping job, there were 916,000 jobs nationally and 14,400 jobs regionally. *Id*. For the kitchen helper job, there were

<u>**Discussion**</u>

**I.      Chronology of Relevant Events, Medical Evidence, and Testimony**

Upon the recommendation of the student health center, Cook initiated counseling

sessions at the University of Louisiana-Monroe ("ULM") in February 2011.  *See* Tr. 255.  At a

February 22, 2011, session, Cook reported that his family life had been very hectic.  (Tr. 255).

He stated that he was a farmer, responsible for multiple cattle back home.  *Id*.  He also was the

first person in his household to attend college.  *Id*.  He felt pressured to return home and help his

family.  *Id*.  His family relied on his physical strength.  *Id*.  He detailed a volatile and tumultuous

relationship with his father.  *Id*.

At a March 15, 2011, counseling session, Cook reported that things were going well in

school and with his family.  (Tr. 256).  He stated that his anxiety medication was helping him,

and he was engaging in recreational activities.  *Id*

At a May 5, 2011, session, Cook reported that he had been bullied and ill-treated by his

father, which contributed to his history of depression, anxiety, and low self-esteem.  (Tr. 257).

He stated that his grades had declined due to low energy, poor concentration, and frequent

absences.  *Id*.  His strengths included artistic skills, and computer knowledge.  *Id*.

On May 6, 2011, Cook told the counselor that he had a history of family and peer conflict

centered upon verbal teasing over his weight.  (Tr. 258).  He reported a long history of emotional

issues that began in 6th grade and continued through his senior year as a result of the emotional

abuse.  *Id*.  He also recounted a history of self-harm to escape painful feelings.  *Id*.  However, he

---

510,000 such positions nationally, and 6,100 positions regionally.  *Id*.  This incidence of jobs
constitutes a significant number of jobs in the "national economy."  42 U.S.C. § 423(d)(2)(A);
*Johnson v. Chater*, 108 F.3d 178, 181 (8th Cir. 1997) (200 jobs at state level and 10,000
nationally, constitute a significant number).

had not had experienced suicidal ideation for the past two years. *Id*. He explained that his grades were borderline, and that he likely would not pass math. *Id*. Cook detailed his interest in music and computers. *Id*. Later that day, Cook's brother contacted the counselor to convey his fears for Cook. (Tr. 259). He explained that one of Cook's high school classmates had written negative comments about Cook on Facebook. *Id*.

On May 11, 2011, Cook's college roommate informed Cook's counselor of the possibility that Cook had written a suicide note during the night. (Tr. 260). The counselor contacted Cook's family to have him evaluated. *Id*.

On May 12, 2011, Cook was seen at, and admitted to the E.A. Conway Medical Center-Psychiatric Unit. (Tr. 202-218). Upon arrival, he was stoic and expressionless. *Id*. He spoke in an emotionless monotone. *Id*. He felt apologetic and shameful about who he was. *Id*. He downgraded himself a lot and was sensitive about being called "fat." *Id*. He presented with a chief complaint of "I just need to end things and get it over with." *Id*. Suicidal ideation had increased over the past week. *Id*. His roommate had found a suicide note. *Id*. Cook endorsed depressed mood, Anhedonia, guilt, low energy, poor appetite, fair concentration, insomnia, psychomotor retardation, increased crying episodes, and increased frustration, all since the end of February. *Id*. His grades had been falling, and he was not himself anymore. *Id*. He reported suffering from depression since the 6th grade because of excessive bullying in high school that constantly haunts him. *Id*. He was called "fat" and other derogatory names. *Id*. He had no auditory/visual hallucinations, current or past, and no manic or psychotic symptoms or homicidal ideation. *Id*. He had a high I.Q. and appeared to be very smart. *Id*. He was hospitalized with a diagnosis of major depressive disorder-severe, recurrent, without psychosis; rule out social phobia; rule out panic disorder, without agoraphobia; rule out Asperger's disorder. *Id*. Upon

7

admission, he had a Global Assessment of Functioning ("GAF") score of 25-30.[3]

Cook was discharged from the hospital on May 31, 2011 with diagnoses of major depressive disorder (severe, recurrent, without psychosis) and panic disorder.  (Tr. 202-204).  At the end of his 20 day stay, Cook felt much better and was no longer depressed.  *Id*.  He had a much better attitude and was more open and accepting of his environment.  *Id*.  He had learned better coping skills, and was ready to put the past behind him.  *Id*.  He was discharged on Prozac, Trazodone and Atenolol.  *Id*.  At the time of discharge, he had a GAF of 55.  *Id*.[4]

On June 3, 2011, Cook underwent screening/intake assessment and psychiatric evaluation at the Louisiana Office of Mental Health ("Monroe Mental Health").  (Tr. 220-222).  He reported that he was living with his parents and working on the family farm.  *Id*.  He stated that the suicidal "thing" had been non-plan-based, with no imminent intent.  *Id*.  He explained that he wrote the "back up suicide letter" in case he failed out of college.  *Id*.  He reported brief mental health services in 10th grade.  *Id*.  He stated that he used to cut and burn himself, but denied doing so for the past several years.  *Id*.  He mentioned that he had been bullied in school because of his weight and higher-pitched voice.  *Id*.  His main hobby was music, and he could play anything

---

[3] "GAF is a standard measurement of an individual's overall functioning level 'with respect only to psychological, social, and occupational functioning.'"  *Boyd*, 239 F.3d at 701 n2 (citing AMERICAN PSYCHIATRIC ASS'N DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS at 32 (4th ed. 1994) (DSM-IV)).

A GAF of 21-30 is defined as "**[b]ehavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment** (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) **OR inability to function in almost all areas** (e.g., largely incoherent or mute)."  DSM-IV, pg. 32.

[4] A GAF of 51-60 is defined as "**[m]oderate symptoms** (e.g. flat affect and circumstantial speech, occasional panic attacks) **OR moderate difficulty in social, occupational, or school functioning** (e.g., few friends, no friends, unable to keep a job).  DSM-IV, pg. 32.

with strings.  *Id*.  He was polite and cooperative, well-spoken and pleasant to talk with.  *Id*.  He was oriented in all spheres.  *Id*.

Cook underwent a psychiatric evaluation at Monroe Mental Health with Scott Zentner, M.D., apparently on June 17, 2011 (but the report was signed on July 15, 2011).  *See*  Tr. 223-224.  Cook reported that he had been experiencing depression associated with suicidal thoughts since 6th grade.  *Id*.  He could not recall a time that he had been in remission of depressive symptoms for longer than six months.  *Id*.  He associated the recent worsening of his depression to failing pre-calculus for the second straight semester.  *Id*.  He stated, however, that he would re-enroll at ULM in the fall because the school had expunged his previous semester's grades as a result of his medical withdrawal.  *Id*.  He was enjoying playing music again, and denied side effects from his medication.  *Id*.  Cook stated that teasing stopped when he began college.  *Id*.  His goals were to get a college degree and a job.  *Id*.  He preferred solitary activities because of social anxiety.  *Id*.  Cook engaged fairly easily with good eye contact.  *Id*.  He was alert and fully oriented.  *Id*.  He had above average IQ, with fair insight and judgment.  *Id*.  Zentner diagnosed major depressive disorder, recurrent, moderate; dysthymic disorder, and social anxiety disorder.  *Id*.  He assigned a GAF of 45-50.  *Id*.[5]

A July 1, 2011, progress note from Monroe Mental Health documents that Cook's speech was non-spontaneous, logical, and relevant.  (Tr. 226)  He reported mood swings, but his sleep was good, with no day-naps.  *Id*.  Cook helped his father with the cattle, but did not complete all things on the to-do list.  *Id*.

---

[5]  A GAF of 41-50 denotes "**[s]erious symptoms** (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting ) **OR any serious impairment in social, occupational, or school functioning** (e.g., no friends, unable to keep a job)."  *Diagnostic and Statistical Manual of Mental Disorders*, Fourth Edition DSM-IV, p. 32.

On July 15, 2011, Cook was seen by Dr. Zentner.  (Tr. 227).  Cook experienced a continual inability to control negative emotions and behavior that stemmed from interpersonal conflict.  *Id*.  He cried frequently during the session because of his frustration.  *Id*.

An August 15, 2011, progress note from Monroe Mental Health documented that Cook was moving into a dormitory and taking 15 hours of classes for the semester.  (Tr. 228).  He also enjoyed playing an online game based in medieval times.  *Id*.  Cook did not voice any other issues or concerns at that time.  *Id*.

On August 25, 2011, Cook filed the instant application for Title XVI Supplemental Security Income payments.  (Tr. 134-139, 146).

In an August 30, 2011, progress note, Cook reported being back on campus, with classes going well.  (Tr. 228).  He stated that he had been spending time with a new girlfriend that he had befriended on Facebook.  *Id*.  He tried to see her at least once per week.  *Id*.  He was sleeping and eating well.  *Id*.

On September 13, 2011, Cook was seen again by Dr. Zentner.  (Tr. 229).  Cook felt that he was adjusting well that semester.  *Id*.  He denied acute psychiatric complaints.  *Id*.  Zentner reminded him to retain a tutor to help him with math.  *Id*.  He noted, however, that, for unknown reasons, Cook seemed to be procrastinating about retaining a tutor.  *Id*.  Cook denied any further conflicts with former classmates from high school.  *Id*.  He took his medication as prescribed, and felt that it helped.  *Id*.

On September 27, 2011, in connection with his disability application, Cook completed a function report in which he stated that, in a typical day, he eats, goes to class, studies homework, and goes to sleep.  (Tr. 157).  He did not have any personal care issues.  (Tr. 158).  He did not need reminders to take his medicine or to handle his personal needs.  *Id*.  He was able to do

10

laundry once per week, and did not need encouragement to do so.  *Id*.  He went outside every day and walked or drove a car.  (Tr. 159).  He was able to use a checkbook and purchase money orders.  *Id*.  However, he could not manage money well.  (Tr. 160).  His hobbies included computers and music.  *Id*.  He did not need anyone to remind him to go places or to accompany him.  *Id*.  However, he did not like being social.  (Tr. 161).  Although he reported trouble concentrating to complete tasks, he was able to pay attention for up to two hours.  *Id*.  He finishes what he starts, and is able to follow step-by-step instructions.  *Id*.  He gets along well with authority figures.  (Tr. 162).  He also handles changes in routine well – usually.  *Id*.  He stated that he sleeps when stressed, and suffers anxiety attacks.  *Id*.

On October 21, 2011, the state agency denied Cook's application for disability.  *See* Tr. 58-71.  In so deciding, the agency relied on the findings of non-examining agency psychologist, Cathy Word, Ph.D., who opined, 1) that Cook's understanding and memory were not significantly limited; 2) that his ability to work in coordination with, or in proximity to others without being distracted, was moderately limited, but there was no other significant limitation to his ability to sustain concentration and persistence; 3) that he was moderately limited in his ability to:  interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; and to get along with co-workers or peers without distracting them or exhibiting behavioral extremes; and 4) that he was moderately limited in his ability to respond appropriately to changes in the work setting, but with no other significant limitations to adaptation skills.  *Id*.

An October 28, 2011, progress note from Monroe Mental Health reflects that Cook had dropped his math class, and had not followed-up on suggestions to retain a tutor because he already had missed too many days.  (Tr. 248).  Cook stated that the class was for 8:00, but he

11

ended up sleeping through it.  *Id*.  He explained that he made a mistake in going to college.  *Id*.
When asked why he did not attend "dbt group" Cook proffered an excuse about it conflicting
with his math class – which it did not.  *Id*.  Cook then admitted that he just did not want to attend
group.  *Id*.  He told his parents that he did not want to attend college, whereupon they told him
that he would have to obtain a job.  *Id*.

Cook returned to Dr. Zentner on December 6, 2011.  (Tr. 249).  Cook reported that he
would not be returning to ULM for the spring semester.  *Id*.  Once again, he was unable to pass
pre-calculus.  *Id*.  Cook decided to put off college indefinitely.  *Id*.  Although he initially was
disappointed, he seemed to have accepted the situation.  *Id*.  He was thinking about getting a job
at McDonalds or Wal-Mart to pay off his college debt.  *Id*.  He complained of daytime sedation,
but denied acute depressive symptoms.  *Id*.  Zentner remarked that Asperger's Syndrome may
explain Cook's chronic symptom cluster.  *Id*.  Cook was very intelligent, but his social
awkwardness with associated dysthymia had limited his ability to achieve independent living
goals.  *Id*.  Zentner noted the possibility of going to a residential treatment center, but he did not
know whether Cook was ready to separate from his parents yet.  *Id*.  Zentner referred Cook to Dr.
Deemer for psychological testing.  *Id*.

On January 5, 2012,[6] Cook took the Personality Assessment Inventory ("PAI") for
assessment of Asperger's Disorder.  (Tr. 240-243).  Associated notes reflect that Cook was
financially unable to complete a degree in computer science because he could not complete one
of his math classes.  *Id*.  He also ended an eight month romantic relationship in November
because his girlfriend was ignoring him.  *Id*.  Cook reported difficulty making friends and
initiating small talk.  *Id*.  He had the most difficulty in group settings.  *Id*.  His eye contact was

---

[6]  The report is incorrectly dated, "2011."

12

poor, but his memory was intact.  *Id*.  His father used to call him "fat" and "retarded," and punch him at times.  *Id*.  He did not currently engage in social interactions with friends.  *Id*.  His scores on the PAI indicated that he was feeling isolated and misunderstood.  *Id*.  His responses suggested that he neither desired, nor enjoyed close relationships with others.  *Id*.  His social isolation minimized the discomfort he felt when forced to engage in social interaction.  *Id*.  Cook felt overwhelmed by his responsibilities and remained nervous much of the time.  *Id*.  He was dissatisfied with his interpersonal relationships.  *Id*.  He also was experiencing distress, likely related to teasing from his youth.  *Id*.

The PAI could not conclusively diagnose Asperger's Disorder.  *Id*.  Cook demonstrated a significant degree of anxiety and ambivalence about social interaction.  *Id*.  However, his style of answering was more indicative of social anxiety disorder than Asperger's.  *Id*.  Accordingly, Eric Deemer, Ph.D., diagnosed social anxiety disorder, avoidant personality features, dependent personality features, and assigned a GAF of 60.  *Id*.

At a January 11, 2012, visit to Monroe Mental Health, Cook denied any problems.  (Tr. 249).  Rather, he was keeping busy working on the farm.  *Id*.  His sleep and appetite were without disturbance.  *Id*.  For leisure, he continued working with music, and doing "cover videos."  *Id*.  He answered questions appropriately.  *Id*.  Cook stated that treatment at mental health had been "pretty good, it's helped [him]."  *Id*.

A February 7, 2012, progress note from Monroe Mental Health documents that Cook was keeping busy with work on the farm and raising cattle.  (Tr. 250).  He took medication as prescribed, without problems.  *Id*.  His parents intended to buy him a travel trailer, so he would have his own space.  *Id*.  He stated that he did not do much socially except for going to Wal-Mart once per week with his mother.  *Id*.  He still enjoyed playing his music.  *Id*.  He stated that he

13

would like to work on the house next door.  *Id*.  Nonetheless, he wanted to appeal his SSI

determination, and had retained a lawyer to do so.  *Id*.  He stated that he and his parents did not

feel like he could hold a job.  *Id*.  When the counselor suggested that Cook could work at Wal-

Mart as a greeter, shopping cart wrangler, or stocker, Cook replied that he had applied at Wal-

Mart, but Wal-Mart was not hiring.  *Id*.  The counselor encouraged him to update his application

at Wal-Mart, and to check and see if they were hiring.  *Id*.  Cook then explained that he had been

in a car accident, and that he did not have any transportation at the time.  *Id*.

On May 1, 2012, Dr. Zentner completed an attorney-supplied medical statement

concerning depression with anxiety.  (Tr. 251-253).  Zentner indicated that Cook suffered from

chronic low self-esteem and social anxiety.  *Id*.  He also suffered mild restriction of activities of

daily living and moderate difficulty in maintaining social functioning.  *Id*.  Deficiencies in

concentration, persistence or pace were unknown, as were repeated episodes of deterioration or

decompensation.  *Id*.  Zentner indicated that Cook suffered "persistent irrational fear of a specific

object, activity or situation which results in a compelling desire to avoid the dreaded object,

activity or situation," and that Cook was unable to function independently outside the area of his

home due to panic attacks.  *Id*.

Furthermore, Cook was not significantly limited in his ability to remember locations and

work-like procedures, or to understand, remember and carry out short, simple, and detailed

instructions.  *Id*.  Also, his ability to maintain attention and concentration for extended period

was not significantly impaired.  *Id*.  His ability to perform activities within a schedule, maintain

regular attendance and be punctual was not significantly impaired.  *Id*.  However, his ability to

interact appropriately with the general public was moderately impaired, as was his  ability to get

along with co-workers without distracting them or to maintain socially appropriate behavior.  *Id*.

14

Likewise, his ability to travel in unfamiliar places or to use public transportation and to set realistic goals or make plans independently of others were moderately impaired. *Id*. Zentner commented that Cook's diagnoses included social anxiety, dysthymic disorder, major depressive disorder – currently in remission. *Id*. His social anxiety and associated avoidant personality persisted. *Id*. The estimated onset of the above limitations was chronic (i.e., greater than or equal to 6 months). *Id*.[7]

At the May 9, 2012, ALJ hearing, Cook testified that he attended college in the fall of 2010. (Tr. 33). He did okay in school until his second semester. *Id*. He failed pre-calculus, and had to re-take it his second semester. *Id*. He had anxiety and could not really handle being around people that much. *Id*. He started taking medication in February of 2011. (Tr. 34). At the time of the hearing, he was taking 60 milligrams of Prozac, generic Fluoxetine, 25 milligrams of Atenolol and 50-100 milligrams of Trazodone, as needed. (Tr. 34). He becomes nervous around somebody he does not know or a large group of people. (Tr. 34). However, he is able to go out of the home. (Tr. 34). He mows the yard, sweeps floors, and cleans up around there. (Tr. 35). He has friends his own age, but rarely sees them. (Tr. 36). He graduated from high school in 2010. (Tr. 36). For fun, he likes to "mess around" on his computer, draw on a writing table, and occasionally play musical instruments. (Tr. 37). He plays guitar, bass, banjo, drums, keyboard. *Id*. He also is learning the violin, little mandolin, and the blues harp. (Tr. 37). He has shown musical pointers to some people, but that is about it. (Tr. 38). He has no problems concentrating when he is on the internet or teaching himself music. *Id*. His medications keep him stable and make him less prone to becoming nervous. (Tr. 39).

---

[7]  Plaintiff's counsel contends that Dr. Zentner wrote "76 months" on the form. It appears to the undersigned, however, that he wrote, "≥6 months," which also makes more sense. Under either interpretation, the court reaches the same result.

According to Cook, Dr. Zentner told him to appeal his disability denial.  (Tr. 41-42).  Although Zentner recommended a residential treatment facility, Cook did not want to go because he felt it would be too restricting.  (Tr. 42).  Cook felt anxious or stressed out every day at school, but was able to handle crowded classrooms by sitting in the rear corner of the room.  (Tr. 43).  Cook.  (Tr. 43-44).  People were a lot more respectful in college.  (Tr. 45).  Cook conceded that he has never received a diagnosis for panic attacks.  (Tr. 45).

## II.     Assignments of Error

###     a)     Step Three

In *Audler v. Astrue*, the Fifth Circuit recognized that the ALJ is required to discuss the evidence and explain the basis for her findings at each unfavorable step of the sequential evaluation process.  *Audler v. Astrue*, 501 F.3d 446, 448 (5th Cir. 2007) (citing 42 U.S.C. § 405(b)(1)).  An ALJ's bare conclusion that the claimant's impairments do not meet or equal a listing does not provide a basis for judicial review to assess whether the finding is supported by substantial evidence.  *Id*.  Nevertheless, an ALJ's failure to adequately explain his step three determination does not require remand unless it affects the claimant's "substantial rights."  *Id*.[8] A claimant's substantial rights are affected at step three when he demonstrates that he meets, or at least appears to meet, the requirements for a listing.  *See Audler, supra*.

To establish that a claimant's injuries meet or medically equal a listing, the claimant must provide medical findings that support all of the criteria for a listed impairment (or most similarly listed impairment).  *See Selders v. Sullivan*, 914 F.2d 614, 619 (5th Cir. 1990).  In determining whether a claimant's impairment(s) equals a listing, all evidence in the case record about the

---

[8] *I.e.*, the error may be harmless.  *Audler, supra* (citing *Morris v. Bowen*, 864 F.2d 333, 334 (5th Cir. 2007)).

16

claimant's impairments and their effects are considered.  20 C.F.R.  § 404.1526(c).  An

impairment that manifests only some of the requisite criteria, no matter how severely, does not

qualify.  *Sullivan v. Zebley*, 493 U.S. 521, 530, 110 S.Ct. 885, 891 (1990).  If the plaintiff fails to

demonstrate the specified medical criteria, the court will find that substantial evidence supports

the ALJ's finding that listings-level impairments are not present.  *Selders*, 914 F.2d at 620.

Plaintiff contends that his impairments meet the listing for anxiety related disorders.  The

relevant section provides:

> 12.06 Anxiety Related Disorders: In these disorders anxiety is either the
> predominant disturbance or it is experienced if the individual attempts to master
> symptoms; for example, confronting the dreaded object or situation in a phobic
> disorder or resisting the obsessions or compulsions in obsessive compulsive disorders.
>
> **The required level of severity for these disorders is met** when the requirements
> in both A and B are satisfied, or **when the requirements in both A and C are
> satisfied**.
>
> A. Medically documented findings of at least one of the following:
>
> 1. Generalized persistent anxiety accompanied by three out of four of the
> following signs or symptoms:  a. Motor tension; or b. Autonomic hyperactivity; or
> c. Apprehensive expectation; or d. Vigilance and scanning; or
>
> 2. **A persistent irrational fear of a specific object, activity, or situation which
> results in a compelling desire to avoid the dreaded object, activity, or
> situation**; or
>
> 3. Recurrent severe panic attacks manifested by a sudden unpredictable onset of
> intense apprehension, fear, terror and sense of impending doom occurring on the
> average of at least once a week; or
>
> 4. Recurrent obsessions or compulsions which are a source of marked distress; or
>
> 5. Recurrent and intrusive recollections of a traumatic experience, which are a
> source of marked distress;
>
> AND

B. Resulting in at least two of the following:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended duration.

OR

C. **Resulting in complete inability to function independently outside the area of one's home.**

20 C.F.R. § Pt. 404, Subpt. P, App. 1, Section 12.06 (emphasis added).

Plaintiff contends that he meets Listing 12.06C because his treating psychiatrist, Dr. Zentner, indicated on the attorney-supplied questionnaire that Cook suffers from persistent irrational fear of a specific object, activity, or situation which results in a compelling desire to avoid the desired object, activity or situation, and the complete inability to function independently outside the area of the patient's home because of panic attacks.  (Tr. 251).

In her decision, the ALJ found that there was no evidence that Cook's symptoms resulted in the complete inability to function independently outside the area of his home as contemplated by 12.06C.  (Tr. 13).  Later in her decision, the ALJ afforded "controlling weight" to Dr. Zentner's opinion.  (Tr. 16).  Nonetheless, she specifically rejected and assigned no weight to Dr. Zentner's finding that Cook was completely unable to function outside the home, because this finding was inconsistent with the medical evidence of record, including Dr. Zentner's associated finding that Cook was but moderately limited in his ability to travel in unfamiliar places or to use public transportation.  *Id*.

Plaintiff argues that because the form completed by Dr. Zentner does not define "moderately impaired," it was unreasonable for the ALJ to assume that Dr. Zentner did not

18

consider Cook to be significantly impaired in his ability to travel independently.  (Pl. Brief, pg. 8).  This argument is not well taken.  The form included boxes for "Not Significantly Impaired," "Moderately Impaired," "Markedly Impaired," and "Extremely Impaired."  Therefore, although a moderate limitation clearly is greater than an insignificant limitation, it is also less than a marked or extreme limitation.  If Cook were completely unable to function outside of the home, then it stands to reason that he also should have been marked or extremely (as opposed to only moderately) limited in his ability to travel or to use public transportation.  For that matter, a complete inability to function independently outside of the home also should have caused more than moderate impairments in his ability to interact appropriately with the general public or to get along with co-workers, as inconsistently found by Dr. Zentner.

Instead, it is manifest that Dr. Zentner did not understand the severity requirement contemplated by Listing 12.06C.  The introductory regulations for Mental Disorders explains that "[t]he paragraph C criterion of 12.06 reflects the uniqueness of agoraphobia, an anxiety disorder manifested by an overwhelming fear of leaving the home."  20 C.F.R. § Pt. 404, Subpt. P, App. 1, Section 12.00F.  The instant record contains substantial evidence that Cook did *not* have an overwhelming fear of leaving his home.  For instance, he attended ULM *and lived in a dormitory* both before and after the alleged onset of disability.  Moreover, in September 2011 – some four months after alleged onset of disability, Cook stated that he was able to go out daily by himself. (Tr. 159).  Even at the time of the hearing, Cook admitted that he could go out of his home.  (Tr. 34).  Although Cook becomes nervous around people, this does not prevent him from being around people, which apparently occurs very often.  *See* Tr. 34.  In addition, Cook planned to move out of his parents' home and into his own travel trailer (albeit, likely parked on his parents' land).  (Tr. 250).

In sum, the court finds that the ALJ provided "good cause" for rejecting that portion of Dr. Zentner's opinion related to the ALJ's step three determination.[9]  Instead, Cook's own statements and testimony, plus other treatment notes provide substantial support for the ALJ's decision.

      b)      <u>RFC</u>

The ALJ stated in her decision that Dr. Zentner

> reports no significant impairment or only moderate impairment in numerous areas of workplace functioning.  Based on this report, it is clear that the claimant can meet the basic mental demands of competitive, remunerative, unskilled work, which include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting. (Social Security Ruling (SSR 85-15).  Accordingly, with respect to the claimant's ability to perform work-related activities, the undersigned affords controlling weight to the treating physician's opinion, as reflected by the findings in this case. (Social Security Ruling 96-2p).

(Tr. 16).

Plaintiff stresses that Dr. Zentner found moderate impairments in Cook's ability to: interact appropriately with the general public; get along with co-workers without distracting them; and to maintain socially appropriate behavior.  *Id*.  He contends that although the ALJ found that he must work in isolation with no public contact, the ALJ's limitation to only "occasional contact with supervisors and coworkers" fails to account for the "moderate" limitations recognized by Dr. Zentner.

The court disagrees.  "Occasionally" is defined as occurring from very little, up to one-third of the time, i.e. no more than about two hours in an eight hour workday.  *See* TITLES II AND XVI: DETERMINING CAPABILITY TO DO OTHER WORK--THE MEDICAL-VOCATIONAL RULES

---

[9]  An ALJ cannot reject a medical opinion without an explanation supported by good cause.  *See Loza v. Apfel*, 219 F.3d 378, 395 (5th Cir.2000) (citations omitted).

OF APPENDIX 2 (SSR 83-10).   Contrary to plaintiff's argument, a limitation to only occasional

contact *is* a significant limitation.   *See Ramirez v. Colvin*, Civil Action No. 12-0262, 2014 WL

1293888, at *12 (N.D. Tex. Mar. 28, 2014) (ALJ's limitation to only "occasional" *contact* with

others sufficiently incorporated physician's finding that plaintiff's ability to relate to or interact

with others was "poor").   Moreover, a limitation to "occasional" contact is at least as severe as

the definition of "moderate limitation" ordinarily employed by ALJs in this area, which the Fifth

Circuit has declined to disturb.   *See Giles v. Astrue*, 433 Fed. Appx. 241 (5th Cir. July 18, 2011)

(unpubl.); *Cantrell v. McMahon*, 227 Fed. Appx. 321, 2007 WL 557567 (5th Cir. 2007) (unpubl.);

*Beene v. McMahon*, 226 Fed. Appx. 348, 2007 WL 836926 (5th Cir. 2007) (unpubl.); and *Zills v.

Barnhart*, 220 Fed. Appx. 289, 2007 WL 627605 (5th Cir. Feb. 27, 2007).

        In addition, plaintiff's own statements and testimony, while not uniform, further support

the ALJ's RFC.   For instance, he indicated that he got along well with authority figures,

including bosses and teachers.   (Tr. 162).   Furthermore, Cook stated that he becomes nervous

around large groups of people or people he does not know.   (Tr. 34).   Thus, a limitation to only

occasional contact with co-workers, together with no contact with the general public, should

account for his condition.

        Plaintiff also faults the ALJ for failing to adopt Dr. Zentner's "moderate" limitations on

his ability to travel to unfamiliar places or to use public transportation and to set realistic goals or

make plans independently of others.   (Tr. 252).   However, the ALJ's RFC recognized that Cook

can "only occasionally adapt to changes in the workplace and make work-related decisions."   (Tr.

14).   He also can not perform work with fast-paced production quotas or travel to unfamiliar

places.   *Id*.   These limitations reasonably and materially incorporate Dr. Zentner's moderate

limitations.

In sum, the ALJ's RFC determination is supported by substantial evidence.

c)      Step Five Determination

Plaintiff challenges the ALJ's step five determination on the basis that the ALJ's hypothetical(s) to the VE failed to include additional limitations that he contends were warranted by the record.  However, a hypothetical need only reasonably incorporate the disabilities and limitations recognized by the ALJ.  *Bowling v. Shalala*, 36 F.3d 431 (5th Cir. 1994).  Here, the ALJ's hypothetical(s) to the VE substantially incorporated the limitations that the ALJ credited in his RFC, and that assessment is supported by substantial evidence.  *See* discussion, *supra*.

Relatedly, plaintiff contends that the ALJ's hypothetical to the VE failed to include moderate limitations in concentration, persistence, and pace that the ALJ adopted during her application of the psychiatric review technique at steps two and three of the sequential evaluation process.  (Tr. 13).  However, the Fifth Circuit has held that a hypothetical that includes "restrictions to rare public interaction, low stress, and simple, one- to two-step instructions reflect that the ALJ reasonably incorporated [the claimant]'s moderate concentration, persistence, and pace limitations such that the hypothetical question was proper."  *Bordelon v. Astrue*, 281 F. App'x 418, 423 (5th Cir. 2008) (unpubl.) (citation omitted).[10]  Citing *Bordelon*, other courts in this circuit have held that an RFC limited to simple work reasonably incorporates a moderate or even *marked* limitation in concentration, persistence, or pace.  *Reid v. Astrue*, Civil Action No. 10-0237, 2011 WL 4101302 (S.D. Miss. Aug. 15, 2011) *report and recommendation adopted,* 2011 WL 4101277 (S.D. Miss. Sept. 8, 2011); *Madrid v. Colvin*, Civil Action No. 12-800, 2013 WL 6641305 (N.D. Tex. Dec. 17, 2013); *Cornejo v. Colvin*, Civil Action No. 11-470, 2013 WL

_____

[10]  Although an unpublished Fifth Circuit decision does not constitute precedent, the fact that it is unpublished reflects the panel's opinion that the case addresses well-settled principles of law.  *See* 5th Cir. Rule 47.5.1-5.

2539710 (W.D. Tex. June 7, 2013).  Here, of course, the jobs identified by the VE all had an "SVP" of 2, which is considered unskilled work,[11] and thus, by definition, "work which needs little or no judgment to do *simple* duties that can be learned on the job in a short period of time." SSR 83-10 (emphasis added).  In addition, Cook admitted that he was able to follow instructions, handle changes in routine, and pay attention for up to two hours at a time – the usual amount of time in between work breaks.  *See* Tr. 161 and TITLES II AND XVI: DETERMINING CAPABILITY TO DO OTHER WORK--IMPLICATIONS OF A RESIDUAL FUNCTIONAL CAPACITY FOR LESS THAN A FULL RANGE OF SEDENTARY WORK (SSR 96-9p).

Finally, plaintiff faults the ALJ essentially for declining to credit all of his self-described limitations.  Although the ALJ found plaintiff to be credible, she further found that the "records [did] not support his level of functioning."  (Tr. 15).  In other words, the ALJ found plaintiff credible, but only insofar as his statements and testimony did not conflict with the ALJ's RFC.

When assessing credibility, the ALJ is required to consider the objective medical evidence, the claimant's statements, the claimant's daily activities, and other relevant evidence. POLICY INTERPRETATION RULING TITLES II AND XVI: EVALUATION OF SYMPTOMS IN DISABILITY CLAIMS: ASSESSING THE CREDIBILITY OF AN INDIVIDUAL'S STATEMENTS, SSR 96-7P (S.S.A July 2, 1996).  The ALJ also must consider inconsistencies in the evidence and conflicts between the claimant's statements and the remainder of the evidence.  20 C.F.R. § 404.1529(c)(4).  However, the ALJ need not follow formalistic rules in his credibility assessment.  *Falco v. Shalala*,  27 F.3d 160, 164 (5th Cir. 1994).

The court stresses that many of plaintiff's statements and much of his testimony in fact

---

[11]   *See* TITLES II AND XVI: USE OF VOCATIONAL EXPERT AND VOCATIONAL SPECIALIST EVIDENCE, AND OTHER RELIABLE OCCUPATIONAL INFORMATION IN DISABILITY DECISIONS (SSR-00-4p).

*support* the ALJ's decision.  For instance, during the period that he purported to be disabled and had applied for disability, plaintiff was attending university.  Moreover, he applied for jobs at Wal-Mart, and when asked by his counselor why he did not follow-up with his applications, Cook replied that it was because Wal-Mart was not hiring– not because he was unable to do the work.

In sum, the court finds that the ALJ's credibility determination satisfied the requirements of 20 C.F.R. § 404.1529, and is supported by substantial evidence.  *See Undheim v. Barnhart*, 214 Fed. Appx. 448 (5th Cir. Jan. 19, 2007) (unpubl.) (opinion as a whole gave sufficient reasons and documentation for the ALJ's credibility determination); *Cornett v. Astrue*, 261 Fed. Appx. 644 (5th Cir. Jan. 3, 2008) (unpubl.) (ALJ gave some weight to claimant's complaints; thus claimant's arguments that his subjective complaints were not given enough weight is unavailing); *Hernandez v. Astrue*, 2008 WL 2037273 (5th Cir. May 13, 2008) (unpubl.) (despite claimant's subjective allegations of pain, the ALJ gave "greatest weight" to treating physician's opinion).

## Conclusion

The ALJ in this case was tasked with determining whether Cook was disabled during the relevant period.  In so doing, she considered the lay testimony, the medical record, and expert opinion evidence.  The evidence was not uniform and, arguably, could have supported a different outcome.  However, conflicts in the evidence are for the Commissioner to resolve.  *Selders v. Sullivan*, 914 F.2d 614, 617 (5th Cir. 1990) (citation omitted); *Grant v. Richardson*, 445 F.2d 656 (5th Cir. 1971) (citation omitted).  This court may not "reweigh the evidence in the record, try the issues de novo, or substitute its judgment for the Commissioner's, even if the evidence weighs

against the Commissioner's decision." *Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000).[12] That is not to say that the ALJ's decision is blemish-free, but procedural perfection in the administrative process is not required, and any errors do not undermine confidence in the decision.

For the foregoing reasons, the undersigned finds that the Commissioner's determination that Cook was not disabled under the Social Security Act is supported by substantial evidence and remains free of legal error.  Accordingly,

IT IS RECOMMENDED that the Commissioner's decision be AFFIRMED, in its entirety, and that this civil action be DISMISSED with prejudice.

Under the provisions of 28 U.S.C. §636(b)(1)(C) and FRCP Rule 72(b), the parties have **fourteen  (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof.  A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing.  Timely objections will be considered by the District Judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE**

---

[12]  Admittedly, this court has expanded upon some of the reasoning given by the Commissioner for her decision.  Generally, courts "only may affirm an agency decision on the basis of the rationale it advanced below." *January v. Astrue*, No. 10-30345, 2010 WL 4386754 (5th Cir. Nov. 5, 2010) (citation omitted).  One exception to this rule, however, is harmless error, i.e. absent the alleged error or omission, there is "no realistic possibility" that the ALJ would have reached a different result. *Id.*  This exception is applicable here. *See also  Foster v. Astrue*, 2011 WL 480036 (5th Cir. Feb. 10, 2011) (unpubl.); *Garth v. Astrue*, 393 Fed. Appx. 196 (5th Cir. Aug. 26, 2010) (unpubl.).

**SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

THUS DONE AND SIGNED at Monroe, Louisiana, this 5th day of January 2015.

KAREN L. HAYES
UNITED STATES MAGISTRATE JUDGE